J-S21009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH R. CALDWELL | : | |
| | : | |
| Appellant | : | No. 1255 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 23, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005791-2019

BEFORE: LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED APRIL 7, 2025**

Kenneth R. Caldwell appeals from the judgment of sentence, entered in the Court of Common Pleas of Delaware County, following his conviction for theft by unlawful taking.[1]  Caldwell challenges the sufficiency and weight of the evidence, as well as the legality and discretionary aspects of his sentence. After careful review, we affirm Caldwell's conviction for theft by unlawful taking, but at a reduced grade, reverse his illegal restitution sentence, and remand with instructions.

The trial court summarized the facts and procedural history of this case as follows:

> On August 15, 2019[, Caldwell] was arrested and charged with []
> theft by unlawful[] taking and [] receiving stolen property[,]
> arising from a continuing criminal episode taking place over

_____

[1] 18 Pa.C.S.A. § 3921(a).

several months[2] in which Caldwell stole hundreds of thousands of dollars[3] from [the v]ictim[,] Dr. Brenda Savage[,] at her home [] in Chester Township, Delaware County[].

In September 2018[,] Savage, [who was] 81 years old, first met [Caldwell], [who was] 35 years old, and encouraged him to attend her church service. [] Savage wanted to assist [Caldwell] with serious issues. Their "relationship" developed rapidly, and [Caldwell] accepted from [Savage] several paid small job opportunities and financial assistance. [Savage testified to being the landlord of more than 250 properties, and that she hired Caldwell to perform property maintenance work for her, like cutting grass. Savage testified that, for his first job, she paid Caldwell $1,800.00 to remove a tree. Caldwell testified that Savage never paid him less than $300.00 a day when he worked for her, which was income in addition to other income he generated from auto-related work he performed with his uncle. Savage also paid off outstanding expenses Caldwell owed, including $4,000.00 in fines and court fees in connection with a 2006 criminal case. Further, Savage gifted Caldwell coins and

---

[2] Although the trial court states that Caldwell's criminal episode took place over several months, as the trial court notes later in its Pa.R.A.P. 1925(a) opinion—and is supported by the testimony and other record evidence— Caldwell would have only had access to commit the charged theft during February 2019.

[3] Savage initially accused Caldwell of stealing $293,500.00. *See* N.T. Non-Jury Trial, 2/1/23, at 80. Later, that sum was recalculated to $300,000.00. *See id.* at 82 ("It was $300,000[.00]. $300,000[.00]. An unequivocal $300,000[.00]. If I gave you $293,[5]00[.00], I don't know why[.])" Savage also accused Caldwell of stealing $200.00 in pennies. *See id.* at 225. Nevertheless, the Commonwealth only sought $300,000.00 in restitution, apparently abandoning its allegation that Caldwell stole $200.00 worth of pennies that Savage had stored in a "2-pound seven-ounce coffee can." *See id.*; *see also* N.T. Sentencing Hearing (Volume I), 3/23/23, at 5 ("As we heard at trial, obviously $200[.00] worth of pennies weighs an incredible amount. Judge, I don't think it's the dollar amount of the pennies that Dr. Savage was concerned with. Those pennies had sentimental value to her, so really what Dr. Savage wants is her pennies back. I don't know if that's a possibility, but at any rate, Judge, we are going to ask the Court to impose restitution in the amount of $300,000[.00]. In terms of proof, Judge, all we have are the pictures of the trunk that we produced at trial.").

$2.00 bills, ostensibly for Caldwell to give to his children. Savage also gave Caldwell $3,000.00 to fix a black Lincoln truck and another $3,000.00 to fix a red car. Savage also gave Caldwell an additional sum of $3,500.00, $1,300.00 of which Caldwell used to purchase a vehicle at auction, and the rest of which he retained.]

In February 2019, [] Savage arranged for [Caldwell] to move into an apartment complex she owned[. B]efore the unit was available, Caldwell stayed with [Savage in her home, which was also where her business office was located]. During this time, and at [] Savage's invitation, their relationship became sexual.[4] [Caldwell] continually[5] had sexual relations with [] Savage and used these opportunities to access parts of [] Savage's house and office[ to steal] large sums of money. By the end of [February 2019], [Caldwell] moved into his [own] apartment[, made available by Savage, as his landlord,] and [Caldwell] no longer had access to Savage's residence.[6] Later[,] in August 2019[,] Savage discovered[7] large sums of cash were missing from her

_____

[4] Savage never reported any sexual relationship with Caldwell and denied having any such relationship with him at trial. Only Caldwell admitted to such a relationship at trial.

[5] Again, Savage denied any sexual relationship; Caldwell only admitted to staying the night with Savage—and having such a relationship—on two separate occasions, which he testified were not consecutive days, prior to the end of February 2019.

[6] The record reflects that Caldwell continued to work for Savage until he was arrested in late May 2019, apparently in connection with the alleged kidnapping of his own child. Ultimately, Caldwell was determined to be the child's biological father, was released from jail in July 2019, and was granted full custody of the child. *See* N.T. Non-Jury Trial, 2/2/23, at 48. While he was in jail and prior to his release, Caldwell made many phone calls from jail, including some to Savage, which were recorded. Some of Caldwell's recorded phone conversations were introduced at trial.

[7] Although the timeline is not entirely clear, Savage testified that Caldwell went to jail on May 26, 2019. *See* N.T. Non-Jury Trial, 2/1/23, at 117. In early June 2019, Caldwell, in a recorded prison phone call with Savage, admitted to taking an envelope of her cash on a prior occasion. *Id.* at 52. Despite the court's summary of the facts finding to the contrary, the record
*(Footnote Continued Next Page)*

_____

actually reflects that Savage discovered the allegedly missing cash from her wooden chest in July 2019, the timing of which is corroborated by prison phone call recordings in which Savage accused Caldwell of the theft of $293,500.00. ***See id.*** at 80 ("I went into my trunk today. You owe me [] $293,500[.00], and you got to get my money today. You didn't get $1[,]500[.00]. You got to give it to me today."); ***id.*** at 214 ("Q: Now she indicated to you that she checked the trunk in July and her key did not fit the lock. Do you recall that? A: I believe that's accurate, yes."). However, Savage did not report the theft to police until early August 2019. ***See id.***, 2/2/23, at 13. Detective Patrick Mullen, who investigated the reported theft, testified regarding his understanding of the timeline of events and the timing of the alleged theft as follows:

> Q. And just so, again, so we have this timeline down, you're not speaking to Dr. Savage until August, but she's telling you about May of 2019, right?
>
> A. Yes.
>
> Q. And she tells you at that time when you asked her how she was sure of the amount, she said she had counted it several months ago and it was $603,500[.00]?
>
> A. Correct.
>
> Q. Several months ago would have been several months prior to May, correct?
>
> A. Yes.
>
> Q. Okay. So, [] end of February, beginning of March?
>
> A. It's in that timeframe, yes.

***Id.*** at 22. In the audio/video recording of her original report of the theft to police, Savage told Detective Mullen her recollection of the timeline of events, as follows:

> MS. SAVAGE: He stayed here. It was during that time that he stole money.
>
> DETECTIVE MULLEN: So[,] March . . .

*(Footnote Continued Next Page)*

desk[8] and wooden chest and realized [Caldwell] was the only person who had access . . . and the opportunity to take the money.[9] [Caldwell] subsequently admitted he stole money from Savage.

Following a non[-]jury trial, on February 6, 2023[,] th[e trial] court rendered a verdict of guilty on the charge of theft by unlawful taking. On March 23, 2023[,] th[e trial] court imposed [a sentence of] 11-and-one-half months to [] 23 months [of incarceration], and three years of consecutive probation. Additionally, the court ordered [Caldwell] to pay [] Savage $100,000[.00 in] restitution.

_____

MS. SAVAGE: It was probably . . .

DETECTIVE MULLEN: Would you say March or beginning of April, something . . .

MS. SAVAGE: Probably the [inaudible] somewhere maybe near the last of [M]arch or the beginning of April.

*Id.*, 2/1/23, at 118. At trial, Caldwell introduced a card written by Savage to Caldwell, offering Caldwell congratulations for completing his first week in his new apartment, which card Savage admitted she dated February 24, 2019. *Id.* at 124.

[8] The trial court states that money was taken from a desk. It appears Savage had an office in a dining room on the first floor of her home. Caldwell admitted to stealing an envelope containing less than $2,000.00 from the dining room. *See* N.T. Non-Jury Trial, 2/2/23, at 51. Caldwell estimated he stole approximately $1,500.00, though he also noted he did not count the money. *Id.* at 53. Except for that envelope of cash, all of the other stolen money and coins were allegedly taken from the wooden chest, which was sometimes referred to at trial as a wooden trunk or box, and which was located on the second floor of Savage's 16-bedroom home.

[9] Although the trial court notes that Caldwell was the only person with access and opportunity to steal from the wooden chest, the court also acknowledges, *see* Trial Court Opinion, 8/24/23, at 21 n.3, and trial testimony confirms, that Savage's disabled brother (who only had one hand) also stayed in the same bedroom of the house as did Caldwell—prior to Savage's discovery of the stolen money—and he had equal access and opportunity until his death in April 2019. *See* N.T. Non-Jury Trial, 2/1/23, at 95-98.

On March 31, 2023[, Caldwell] filed a post[-]sentence motion[, which the court denied] on April 28, 2023[.]

Trial Court Opinion, 8/24/23, 1-3.

Caldwell filed a timely notice of appeal. Both Caldwell and the trial court have complied with Pa.R.A.P. 1925. On appeal, Caldwell raises the following issues for our review:

1. Whether the evidence was insufficient as a matter of law to support the conviction for felony-grade theft by unlawful taking, where the evidence at trial failed to establish that [Caldwell] took property (currency) valued in excess of $100,000[.00].

2. Whether the trial court erred in denying [Caldwell]'s motion for a new trial, as the verdict was against the weight of the evidence[,] where the evidence of record was so inherently unreliable such that the determination of [Caldwell]'s guilt was based purely on speculation and conjecture, in violation of [Caldwell]'s constitutional rights under the state and federal constitutions.

3. Whether the [trial] court erred and violated the [standards governing the] discretionary aspects of sentencing in this case, when it imposed $100,000[.00] in restitution with no basis in the record to support this sum, in violation of the 6th, 8th, and 14th Amendment[s] to the U.S. Constitution, Article 1, §§ 6, 8, and 9 of the Pennsylvania Constitution[,] and the Pennsylvania Sentencing Code[,] 42 Pa.C.S.[A.] § 9701 et seq.

Appellant's Brief, at 5 (reordered for ease of disposition).[10]

First, Caldwell purports to challenge the sufficiency of the evidence to support his conviction for theft graded as a felony where the evidence does

_____

[10] In his reply brief, Caldwell also argues for the first time that his sentence is illegal because the sentencing court did not specify the method of restitution. In light of our disposition, we need not reach the merits of this claim, which Caldwell is free to raise again with the trial court on remand at resentencing.

not support the court's finding that he took property valued in excess of $100,000.00.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence[,] coupled with the reasonable inferences drawn therefrom[,] overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact[-]finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa. Super. 2019) (citation and brackets omitted). Further,

> [i]n applying the above test, the entire record must be evaluated and all the evidence actually received must be considered.[11]

---

[11] The jail phone conversation recordings that were introduced at trial were not included in the certified record on appeal. Nevertheless, we may overlook this deficiency because it does not hinder our appellate review since the trial transcripts included in the certified record contain transcriptions of the relevant phone conversations, and the trial witnesses also testified, as reflected therein, regarding what they heard, and said, on those recordings.

Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Sanchez*, 848 A.2d 977, 982 (Pa. Super. 2004)

The Pennsylvania Crimes Code defines theft by unlawful taking as follows:

**§ 3921. Theft by unlawful taking or disposition**

**(a) Movable property.—**A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa.C.S.A. § 3921(a). "Movable property" is defined as "[p]roperty[,] the location of which can be changed, including things growing on, affixed to, or found in land, and documents[,] although the rights represented thereby have no physical location." *Id.* at § 3901. "Deprivation" occurs if a person: (1) "withhold[s] property of another permanently or for so extended a period as to appropriate a major portion of its economic value"; or (2) "dispose[s] of the property so as to make it unlikely that the owner will recover it." *Id.*

Further, this Court has long observed that "value is not an essential element of the crime of theft. Rather, **the value of the stolen items becomes relevant only to establish the grade of the offense** for purposes of imposing sentence." *Commonwealth v. Farmer*, 368 A.2d 748, 752 (Pa. Super. 1976) (citation and quotation marks omitted; emphasis added). Nevertheless, "a claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence[,]" which is non-waivable, assuming jurisdiction is proper. *Commonwealth v. Hoffman*, 198

A.3d 1112, 1123 (Pa. Super. 2018) (citation, quotation marks, and brackets omitted); ***Commonwealth v. Berry***, 877 A.2d 479, 482 (Pa. Super. 2005) (explaining court may entertain challenge to legality of sentence so long as court has jurisdiction to hear claim).

Here, in reviewing the sufficiency of the evidence, Caldwell admitted to taking an envelope of cash from Savage's dining area, which was corroborated by his admissions on the jail call recordings that were admitted into evidence at trial. Caldwell valued the stolen cash at more than $1,000.00 and less than $2,000.00, but admitted he did not count it, so he estimated the value at $1,500.00. ***See*** N.T. Non-Jury Trial, 2/1/23, at 52; ***id.***, 2/2/23, at 51-53. This is sufficient evidence to sustain Caldwell's conviction for theft by unlawful taking. ***See*** 18 Pa.C.S.A. § 3921(a); ***see also Sebolka***, ***supra***. We conclude that Caldwell's challenge is actually a challenge to the legality of his sentence insofar as he argues that it was not proven beyond a reasonable doubt that he stole property valued in excess of $100,000.00. ***See Commonwealth v. Panko***, 975 A.2d 1189, 1191-93 (Pa. Super. 2009) (analyzing theft valuations under legality of sentence standard of review; citing ***Apprendi v. New Jersey***, 530 U.S. 466 (2000) and noting that "a fact that increases the maximum penalty or changes the grade of an offense must be submitted to a [fact-finder] and proven beyond a reasonable doubt").

Next, having found the record evidence sufficient to sustain Caldwell's theft conviction, we review his weight of the evidence claims. The appellate standard of review for a challenge to the weight of the evidence is well-settled:

The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.

\* \* \*

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

\* \* \*

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Mucci*, 143 A.3d 399, 410-11 (Pa. Super. 2016) (citations and quotation marks omitted). To prevail on a weight of the evidence challenge, the evidence must be so tenuous, vague, and uncertain that the verdict shocks the conscience of the trial court. *See Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003). *See also Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa. Super. 2009) (weight claim premised on credibility challenge is not cognizable unless it alleges that evidence is so unreliable as to make any verdict based thereon "pure conjecture").

Here, we discern no abuse of discretion in the trial court declining to grant Caldwell a new trial where Caldwell, himself, admitted to stealing

- 10 -

Savage's envelope of cash that he valued, both at trial and in the recorded prison phone conversations, at $1,500.00. *See Mucci*, *supra*. Caldwell is not entitled to any relief based on the weight of the evidence.

Next, we review Caldwell's challenge to the legality of his sentence. As noted above, Caldwell urges that his sentence is illegal insofar as it was not proven beyond a reasonable doubt that he stole at least $100,000.00. We agree and find that Caldwell's sentence must be vacated and that we must remand for resentencing.

The value of the stolen property determines the classification of the theft offense. *See Commonwealth v. Figueroa*, 859 A.2d 793, 797 (Pa. Super. 2004); *see also Farmer*, *supra*. The Commonwealth bears the burden to establish the value of the stolen property. *See Commonwealth v. Hanes*, 522 A.2d 622, 625 (Pa. Super. 1987). To properly grade the crime of theft by unlawful taking for sentencing purposes, section 3903 of the Pennsylvania Crimes Code sets forth various gradation thresholds, and designates, *inter alia*, the offense as a second-degree felony if "[t]he amount involved is $100,000[.00] or more but less than $500,000[.00]." 18 Pa.C.S.A. § 3903(a)(5). All thefts that are not otherwise specifically graded by the statute are graded as first-degree misdemeanors. *See id.* at § 3903(b). When determining the grade for a conviction for theft by unlawful taking, "[t]he Commonwealth is not required to establish the *precise* market value of the stolen property. Rather, the Commonwealth must present evidence from which **a reasonable jury may conclude** that the market value was *at least*

- 11 -

a certain amount." **Hanes**, **supra** at 625 (italics in original; bold emphasis added). "A proprietor's statement of the value of stolen goods is sufficient to establish the value of those goods in criminal cases and the weight to be accorded to such testimony is for the finder of fact." **Commonwealth v. Stafford**, 416 A.2d 570, 573 (Pa. Super. 1979).

Instantly, the trial court sentenced Caldwell for theft by unlawful taking graded as a second-degree felony, which could only be supported by the record in this case if the court relies on Savage's claim that Caldwell allegedly stole at least $98,500.01 from her wooden chest, in addition to the $1,500.00 Caldwell admitted to taking from the envelope. Here, Savage, the wooden chest's proprietor, testified to the value of the stolen cash therefrom—$300,000.00—which ordinarily is sufficient to establish its value for purposes of grading the defendant's theft offense. **See Stafford**, **supra**. However, after our review, we conclude that the trial evidence of the theft from the wooden chest is so weak, contradictory, and inconclusive, that, as a matter of law, no fact-finder could draw any probability of fact from the combined circumstances to establish that any amount was stolen from the wooden chest. **See Hanes**, **supra**. More specifically, the evidence was too weak and inconclusive on key issues, including: (1) how Savage calculated the loss, if any, from the wooden chest; and (2) when Savage accessed her chest, both to contribute to and draw funds from it.

To explain how she calculated the allegedly stolen sum from the wooden chest, Savage testified at trial as follows:

A: I can tell because as we are going to see, I think, on the pictures that [D]etective [Mullen] came and took, the money [was] in the chest[.]

Q: Okay.

A: . . . [I]t was in columns [] and each column had above it the amount in the column. You follow?

* * *

Q: In your hand. You kept track of how much was in each column[?]

A: Yes, yes.

Q: Okay. And the denominations, the currency, were they banded? Were they wrapped?

A: They were banded. Well, if you mean banded, you mean wrapped or whatever . . .

Q: Yes.

A: Yes, yes.

N.T. Non-Jury Trial, 2/1/23, at 22-23. Savage further explained how she calculated her losses:

A: Simple deduction. Basic math. I added what was left and subtracted it from what should have been there.

Q: And how did you know what should have been there? Had you counted in the months previous?

A: **[E]ach time I added or took something out, I notated.** Bear in mind, I hope I told you earlier that that wasn't a weekly or daily thing. **When large expenditures had to be made—for example, I think the year that he did that, my taxes were $382,000[.00].**

Q: Your property taxes[?]

A: **And that's when I'd go into there and I'd [] subtract whatever.** It's that way. You follow? So[,] it wasn't—because every day I would not do that. I would not do that. But whatever

- 13 -

was reflected on those notes at the top at the time that trunk was entered is precisely what was in that trunk—precisely. []

Q:  What time of year would your property tax—when would you have gone into that trunk, do you think?

A:  Pardon?

Q:  When would you have gone into that trunk to retrieve cash prior to making this discovery?

A:  **I would have gone into that trunk when the school taxes came due**, when the city taxes came due, when the township taxes came due, when school, city, county, and there's another one.  The school taxes, and that's for two now.  That's for the city, schools, and you got Darby Township.  Bear in mind, I'm talking about two locations.  So[,] you've got two school tax, two city taxes, county tax, **and all the other kinds of taxes that Pennsylvania hangs on our necks to crucify us**.

Q:  Okay.

A:  **So[,] when the big taxes were due, that's when I would go to there for whatever.  So[,] I don't remember exactly what time of year, exactly when he, you know, whatever**, but I had not gone into that to take out money that would have altered—had not been altered.

*    *    *

Q:  So is it my understanding[,] then[,] that **you would retrieve cash when you needed to subsidize what was available in your bank accounts to make your tax payments**?

 A:  **Precisely**.

*Id.* at 75-77 (emphasis added).

Savage further testified at trial regarding how often she accessed the wooden chest, stating, "**at least perhaps once a month**, but certainly at tax time, major tax time." *Id.* at 29 (emphasis added).  Savage also testified that she opened the chest at the end of each month. *See id.* at 163.  By contrast, Detective Mullen testified at trial that, during his interview with Savage when

she initially reported the theft to police, "[**Savage**] **indicated she had not opened the trunk in months**, **so she doesn't know when the money went missing**." *Id.* at 218 (emphasis added).

When Savage was asked at trial why her accounting of the missing money changed—why she increased the figure from $293,500.00 in the jail phone call to $300,000.00 at trial—Savage responded that, "[i]t was $300,000[.00]. $300,000[.00]. **An unequivocal $300,000[.00]. If I gave you $293,[5]00[.00], I don't know why[.]**" *Id.* at 82 (emphasis added). Later at trial, when further explaining the discrepancy in her accounting of the stolen funds, Savage testified that:

A: It's [$]300,000[.00].

Q: So[,] where did the other . . .

A: **We make mistakes.**

Q: . . . $6[,]500[.00] come from?

A: **[B]ecause I counted incorrectly because he stole two-dollar bills as well.** His mother told me. **So[,] he had tons of two-dollar bills and he must have sucked a couple ones in there. All I know, ma'am, is that he owes me $300,000[.00], and that's what's missing, and my pennies.**

*Id.* at 166 (emphasis added).

Further compounding the confusion, at trial, Detective Mullen explained that he was not permitted to count the money in the trunk as part of his investigation into the alleged theft:

Q: **Okay. So[,] there's no way of knowing that what she has listed in that trunk actually matches those tally marks she has there.**

A: **That would be accurate.**

Q: Okay. So[,] she indicates there was over $600,000[.00] to start with, but other than her word, there's nothing showing that that actually occurred.

A: **Other than the observation that [] it was a large sum of money, yes, but it was not counted, no.**

Q: All right. So[,] and then even the stacks that are wrapped, you know, I know you can see the bill on the top, but **you can't necessarily see—you can't necessarily see the bills that are behind it in that wrapper.**

A: **No, not [] just by observing them, no.**

\*     \*     \*

A: I think they were actually 20-dollar bills that I actually grabbed.

Q: Okay. So[,] you looked at the one stack[?]

A: [Y]eah.

Q: [B]ut you didn't look at . . .

A: I didn't look at all . . .

Q: . . . anything else[?]

A: No, I did not.

*Id.* at 217 (emphasis added).

When imposing Caldwell's sentence, the court, the fact-finder in this case, lamented that it could not identify what record evidence substantiated its restitution order, "I'm sentencing [Caldwell] to 11½ to 23 [months' incarceration,] plus three years of consecutive probation. Restitution in the amount of $100,000[.00] is ordered. **I can't tell you where I got that number because I have no idea where the numbers are coming from in this case.**" N.T. Sentencing Hearing (Volume II), 3/23/23, at 40

(emphasis added). Indeed, even prior to ordering the restitution sentence, the trial court expressed its frustration in determining the amount stolen from the wooden chest:

> My problem in determining the amount is that we have here a victim[, Savage,] who is an intelligent, educated, sophisticated person, a professor, who obviously knows how to keep good records, but cannot tell me exactly where these funds came from[.] . . . I recall during the trial that . . . some of the money was rent money, that the money in the trunk would fluctuate because [Savage] would take the money and pay taxes, real estate taxes, with it. So[,] that would indicate to me that rent money was going in there, but **there's no record of what money was going in there**. **I don't know. It's kind of in flux.**

*Id.* at 24 (emphasis added).

Here, **as admitted by the fact-finder** at the sentencing hearing, the evidence was too weak and inconclusive to determine the true value of Savage's losses from the wooden trunk, **let alone whether there was _any_ loss at all from the wooden trunk**. *See id.* at 40 ("I can't tell you where I got that number because I have no idea where the numbers are coming from in this case.") The Commonwealth failed to meet its burden to establish, beyond a reasonable doubt, that any property was taken from the wooden trunk, let alone that it was worth **at least** $100,000.00.[12] *See*

---

[12] Although the trial court determined that Caldwell stole "at least $100,000.00," this finding was not based on facts proven beyond a reasonable doubt. *See* N.T. Sentencing Hearing (Volume II), 3/23/23, at 25; *see id.* at 40 ("I can't tell you where I got that number because I have no idea where the numbers are coming from in this case."). *See also Panko*, *supra*.

*Hanes*, *supra*; *Panko*, *supra*.   Indeed, no fact-finder could conclude that the market value of the alleged loss from the wooden chest was at least a certain amount on this contradictory record, especially where the supposed supporting documentary evidence—the sticky notes with handwritten tally marks—was never admitted at trial or presented to the court prior to sentencing, and any evidence regarding the amounts in the chest prior to the alleged theft was vague and speculative.  *See* N.T. Sentencing Hearing (Volume II), 3/23/23, at 16 (trial court stating:  "During the trial[,] Dr. Savage indicated that she does keep meticulous records.  We haven't seen that.  We haven't seen any meticulous records that she talked about.").  On this record, the evidence only supports that Caldwell stole, **at least**, $1,500.00, which results in grading his theft by unlawful taking offense as a first-degree misdemeanor.  *See* 18 Pa.C.S.A. § 3903(b).  Accordingly, we conclude that Caldwell's sentence must be vacated because it was based on an improper grading of the offense as a felony; the record only supports sentencing on this conviction as a first-degree misdemeanor.  *See Hanes, supra* at 625.  *See also Commonwealth v. Nellom*, 234 A.3d 695, 700 (Pa. Super. 2020) (citing *Apprendi* and remanding for resentencing because sentence illegal since fact-finder could not find necessary facts beyond reasonable doubt to elevate grade of theft offense).

In turning to Caldwell's illegal restitution claims, we note that,

> [a] claim that implicates the fundamental legal authority of the court to impose a particular sentence constitutes a challenge to the legality of the sentence.  If no statutory authorization exists

for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. When the legality of a sentence is at issue on appeal, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Catt***, 994 A.2d 1158, 1160 (Pa. Super. 2010) (en banc) (citations and quotation marks omitted).

"In the context of criminal proceedings, an order of restitution is not simply an award of damages, but, rather, a sentence." ***Commonwealth v. Stradley***, 50 A.3d 769, 771 (Pa. Super. 2012) (citation and quotation marks omitted). An appeal from an order of restitution, claiming such order is unsupported by the record, challenges the legality of the sentence rather than the discretionary aspects of sentencing. ***See id.***

"[T]he primary purpose of restitution is rehabilitation of the offender. Consequently, recompense to the victim is only a secondary benefit, as restitution is not an award of damages, a proposition reinforced by the General Assembly's 1995 amendment of Section 1106[[13] of the Pennsylvania Crimes

_____

[13] Section 1106, governing restitution for injuries to person or property, provides in relevant part as follows:

> **(a) General rule.—**Upon conviction for any crime wherein:
>
>> (1) property of a victim has been stolen, converted[,] or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime; or
>>
>> (2) the victim, if an individual, suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.

*(Footnote Continued Next Page)*

- 19 -

Code,] making restitution mandatory rather than discretionary."
***Commonwealth v. Petrick***, 217 A.3d 1217, 1225-26 (Pa. 2019) (citations
and brackets omitted). The reason for imposing restitution is the rehabilitative
goal it serves "by impressing upon the offender the loss he has caused and
his responsibility to repair that loss as far as it is possible to do so."
***Commonwealth v. Kerr***, 444 A.2d 758, 760 (Pa. Super. 1982) (citation and
quotation marks omitted).

"Restitution is proper only if there is a direct causal connection between
the crime and the loss." ***Commonwealth v. Lekka***, 210 A.3d 343, 358 (Pa.
Super. 2019) (citation and brackets omitted). "Because restitution is a
sentence, the amount ordered must be supported by the record[] and may
not be speculative." ***Id.*** (citation omitted). "[A]ny restitution ordered must

---

\* \* \*

**(c) Mandatory restitution.—**

(1) The court shall order full restitution:

\* \* \*

(2) At the time of sentencing the court shall specify the amount and method of restitution. In determining the amount and method of restitution, the court:

(i) Shall consider the extent of injury suffered by the victim, the victim's request for restitution as presented to the district attorney in accordance with paragraph (4) and such other matters as it deems appropriate.

18 Pa.C.S.A. § 1106(a)(1)-(2); (c)(1), (2)(i).

flow from only those crimes for which a defendant is convicted, and not any underlying, unproven, conduct." ***Commonwealth v. Zrncic***, 167 A.3d 149, 152 (Pa. Super. 2017). "Section 1106 requires a 'direct nexus' between the loss claimed and the crime for which Appellant was convicted[.]" ***Id.*** at 153 (citation and emphasis omitted). "In a case of theft by receiving stolen property, a reviewing court will not countenance a sentence provision which requires restitution for property which the Commonwealth has not proven was either stolen or received by the defendant."[14] ***Commonwealth v. Reed***, 543 A.2d 587, 589 (Pa. Super. 1988) (citation, quotation marks, and brackets omitted).

Since we have determined that the record evidence does not support sentencing Caldwell in connection with the alleged theft from the wooden trunk, we conclude that there is only record support for, and a direct causal nexus to, an order of restitution of $1,500.00 relating to Caldwell's admitted theft of cash from the envelope. ***See Reed***, ***supra***; ***Lekka***, ***supra***; ***Zrncic***, ***supra***. Any greater award of restitution would be based on mere speculation

---

[14] This Court acknowledges that the holding in ***Reed*** is based on the offense of receiving stolen property, rather than theft by unlawful taking, which is the offense at issue herein. Nevertheless, we conclude that ***Reed***'s statement of law concerning receiving stolen property is equally applicable to theft by unlawful taking. ***See*** 18 Pa.C.S.A. § 3903 (setting forth single gradation scheme for sentencing for criminal theft offenses); ***see also*** 18 Pa.C.S.A. § 3902 ("An accusation of theft may be supported by evidence that it was committed in any manner that would be theft under this chapter, notwithstanding the specification of a different manner in the complaint or indictment."). Further, although not sentenced on that count, the trial court also convicted Caldwell of receiving stolen property in this case.

and would be unconnected to the crime for which Caldwell was properly convicted. Accordingly, we vacate Caldwell's restitution sentence awarding $100,000.00 to Savage and remand to the sentencing court for entry of an amended order awarding restitution to Savage in the amount of $1,500.00.[15]

Conviction affirmed. Judgment of sentence and restitution order vacated. Case remanded with instructions to impose sentence on theft by unlawful taking, graded as a first-degree misdemeanor, and to impose an order awarding restitution to Savage in the amount of $1,500.00 solely regarding the theft of cash from the envelope. Jurisdiction relinquished.

Murray, J., Joins this Memorandum.

Nichols, J., Files a Concurring and Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/7/2025

---

[15] Due to our disposition, we need not reach Caldwell's discretionary aspects of sentencing challenges to his sentence of restitution based on his claims that his sentence was unsupported by the record.